1

Sandy D. Baggett
P.O. Box 1069
Spokane, WA 99201

2

sandy@sandybaggett.com
(509) 822-9022

3

4

5

6

United States District Court
Eastern District of Washington

7

8

United States of America,

| No. 2:21-CR-142-TOR

9

Plaintiff,

| Defendant's Sentencing

10

v.

| Memorandum and Motion for
| Downward Departure

11

CALEB RYAN CARR,

12

Defendant.

13

14

15

16

17

18

19

DEFENDANT'S Sentencing Memorandum and Motion for Downward
Departure

1

The defendant, Caleb Carr, through appointed counsel, Sandy Baggett, submits this motion for downward departure or in the alternative for a variance downward, and requests that the court sentence him to 12 years of incarceration with 5 years of post-release supervision.

## Discussion

While the district court is required to properly calculate the Guidelines, it must sentence according to the overarching factors set out in 18 U.S.C. § 3553(a). That section requires a district court to impose a sentence that is "sufficient, but not greater than necessary," to achieve the goals of sentencing. *Kimbrough v. U.S.*, 552 U.S. 85, 90 (2007). "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. U.S.*, 555 U.S. 350, 352 (2009). *See also Gall v. U.S.*, 552 U.S. 38, 48-50 (2007); *Rita v. U.S.*, 551 U.S. 338, 350-51 (2007). "[T]he sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson*, 555 U.S. at 351. The judge's obligation to calculate the Guideline range "first," however, means only that the judge should resolve disputes about Guidelines and any application issues first.

The statute requires the district court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of 18 U.S.C. § 3553(a). Those purposes are:

(2) the need for the sentence imposed

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). These factors represent the major sentencing considerations of "retribution, deterrence, incapacitation and rehabilitation." *Tapia v. U.S.*, 564 U.S. 319, 325 (2011).

Section 3553(a) sets out what the court must consider in choosing the "particular sentence" that complies with the "overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing." *Kimbrough,* 552 U.S. at 101. *See also Freeman v. U.S.*, 131 S. Ct. 2685, 2692 (2011). The judge "shall consider" the nature and

circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the purposes of sentencing, § 3553(a)(2); the kinds of sentences available by statute, § 3553(a)(3); the kinds of sentence and sentencing range recommended by the Guidelines and any "pertinent" policy statement issued by the Commission, § 3553(a)(4) & (5); the need to avoid unwarranted disparities, § 3553(a)(6); and the need to provide restitution to any victims, § 3553(a)(7).

While bound to consider the Guidelines, the district court cannot impose a sentence that is greater than necessary to accomplish the sentencing goals set out in § 3553(a). *Kimbrough*, 552 U.S. at 91. This "parsimony principle" can lead a district court to conclude that the sentencing range recommended by the Guidelines is simply too high. *U.S. v. Mendoza*, 543 F.3d 1186 (10th Cir. 2008).

1. **In this case, a Guidelines sentence conflicts with the §3553 requirement that the sentence be "sufficient but not greater than necessary" because the range recommended by the Guidelines is simply too high**

The Guidelines in this case, as calculated in the Presentence Investigation Report, do not fully implement the statutory objectives of sentencing. Under §3553(a), a court must consider a defendant's individual characteristics along with the enumerated reasons for imposing a particular sentence (e.g., deterrence, just punishment, etc.). Where the Guidelines fail to properly reflect these

considerations, a departure or variance may be warranted. *See Spears v. U.S.*, 555 U.S. 261 (2009); *Rita v. U.S.*, 551 U.S. 38, 349-51 (2007) (sentencing courts may depart from the Guidelines where a Guidelines sentence "fails properly to reflect § 3553(a) considerations"). Although the Guidelines discourage the use of individual characteristics to give a sentence outside of the Guidelines range (see Introductory Commentary to U.S.S.G. § 5H), courts routinely find that individual characteristics warrant below-Guidelines sentences.

Further, courts may vary downward where a departure standard is not met. Courts have broad discretion to vary downward. *See, e.g., U.S. v. Chase*, 560 F.3d 828 (8th Cir. 2009) (remanding where defendant's advanced age, military service, health issues, and employment history could all warrant a downward variance under § 3553(a)). This is true even where a related departure is denied. *See U.S. v. Jenkins*, 537 F.3d 1 (1st Cir. 2008) (affirming district court's 62-month downward variance where the sentencing court denied a departure for overstated criminal history based on the defendant's gross recidivism but varied downward because the defendant was a low-level, non-violent drug offender).

**2. In this case, the personal characteristics of the defendant warrant a downward departure or variance from the Guideline range**

Caleb's family and childhood background are not discussed in depth in the

Presentence Investigation Report. However, he has submitted to the court a collection of letters from family and friends to give the court an idea of the kind of person he is and the community and family around him. As the court can see from the letters, Caleb grew up in a stereotypical, middle-class, suburban family, attended high school, played competitive football and track, was homecoming king, was generally very successful and on the road to college at Eastern Washington, loved by family, and happy in life. Those letters also reveal that Caleb lived a life of good deeds and integrity. Throughout school he worked in a soup kitchen, and he supported his female classmates who were victims of sexual assault and helped them with reporting.



1

2

3

4

5

6

7



8

9

10

11

12

13

14

15

16

17

18

19

        Caleb delayed entering college so that he could work for a year to save

money to pay for school himself. He found good work at an HVAC installation

company and paid for his own apartment. That life all turned upside down when

the pandemic hit, Caleb was laid off work and found himself basically homeless. He

did not want to be a financial burden on his family, and he started selling small

amounts of marijuana to have enough money for food. Then came an ad on

Snapchat that seemed to solve all of his problems, offering a more exciting life

with travel and leisure by selling drugs. Caleb got caught up in selling and

ultimately did not know how to extricate himself.

        Caleb was recently examined by Dr. Paul Wert, Ph.D, a licensed

psychologist.[1] Dr. Wert concluded from his assessment that Caleb is young, naïve, and impressionable, and that Caleb suffers from certain mental health issues that exacerbate these same characteristics.

The evidence in this case also demonstrates over and over that Caleb lacked any criminal sophistication and was incredibly naïve about what he was doing. Within weeks of beginning to sell drugs, federal agents had already discovered Caleb, co-defendant Hunter O'Mealy, and their sales methods. The only reason the conspiracy lasted six-months was because federal agents stood by, continued to conduct surveillance, continued to seize drugs, and allowed Caleb and Hunter to continue on the street. Caleb was literally under law enforcement surveillance for the entirety of this six-month conspiracy.

Caleb was naïve enough to believe the Confidential Source when he told Caleb that he could hack phones, conduct all manner of secret research on other people, and could configure phones so that they could not be traced. Because of this complete naivete, Caleb turned over all his phones to the CS, who gave them to law enforcement to put in place tracking and tracing devices.

Caleb and Hunter were so unsophisticated that they did nothing to hide

---

[1] Dr. Wert's final report is not available at the time of this filing because he had a catastrophic family medical emergency over the last few weeks that has prevented him from completing the work. The information provided here comes Dr. Wert's summary of his findings given to counsel over the phone.

DEFENDANT'S Sentencing Memorandum and Motion for Downward Departure

8

their drug dealing. As evidenced by the car stop of Hunter, they drove around in cars with drugs just sitting on the seat out in the open. They did not surreptitiously transfer drugs to buyers; they just put them in the U.S. mail, often using the same post office. Caleb did not even have the sense not to purchase drugs from different Mexican cartels. He was taken out into the desert in Arizona, beaten, and left for dead because of this.

The government seems to believe that their childhood playground name, "Fetty Brothers" (as though they were a boyband), somehow equates to the sophistication of the Sinaloa Cartel. However, the evidence presented simply does not bear this out, and instead demonstrates a complete lack of sophistication and planning.

Caleb and Hunter were recruited on Snapchat by drug dealers, and likely targeted because of their lack of sophistication, their naivete, and their youth. The DEA has recognized that this is now a tactic by drug dealers and cartels to recruit kids like the defendants here. See, for example:

https://www.foxnews.com/opinion/cartels-social-media-teens-smuggling-migrants-mark-brnovich-mark-dannels

https://www.dea.gov/stories/2019/2019-01/2019-01-28/educational-program-launched-san-diego-high-schools-educate?language=es

The solution cannot be to simply lock up in federal penitentiaries for decades at a time all of the youth in America like Caleb who are being targeted by drug dealers in this way.

### a. **A downward departure or variance is warranted based on the young age and maturity level of the defendant**

A defendant's youth is a valid consideration in sentencing.[2] *See Gall v. U.S.*, 552 U.S. 38, 58 (2007) ("Immaturity at the time of the offense conduct is not an

---

[2] A sentencing court may not deny a below-Guideline sentence based on a factor that is pertinent to one or more statutory purposes of sentencing simply because one of the Commission's policy statement deems the factor never or not ordinarily relevant. *See, e.g., U.S. v. Simmons*, 568 F.3d 564 (5th Cir. 2009); *U.S. v. Chase*, 560 F.3d 828 (8th Cir. 2009). In *Gall v. United States*, the Supreme Court upheld a non-Guideline sentence in which the judge imposed probation based on circumstances of the offense and characteristics of the defendant which the Guidelines' policy statements prohibit, i.e., voluntary withdrawal from a conspiracy, or deem "not ordinarily relevant," i.e., age and immaturity, and self-rehabilitation through education, employment, and discontinuing the use of drugs. 552 U.S. 38, 52-59 (2007). In approving the sentence and the factors upon which it

inconsequential consideration. Recent studies on the development of the human

brain conclude that human brain development may not become complete until the

age of twenty-five …. [T]he recent [National Institute of Health] report confirms

that there is no bold line demarcating at what age a person reaches full maturity.

While age does not excuse behavior, a sentencing court should account for age

when inquiring into the conduct of a defendant."); *Roper v. Simmons*, 543 U.S.

551, 567 (2005) ("Today our society views juveniles, in the words Atkins used

respecting the mentally retarded, as categorically less culpable than the average

criminal…. A lack of maturity and an underdeveloped sense of responsibility are

found in youth more often than in adults and are more understandable among the

young. These qualities often result in impetuous and ill-considered actions and

decisions…. The susceptibility of juveniles to immature and irresponsible behavior

means "their irresponsible conduct is not as morally reprehensible as that of an

adult …. The relevance of youth as a mitigating factor derives from the fact that

the signature qualities of youth are transient; as individuals mature, the

_____

was based, the Court made no mention of the Commission's conflicting policy

statements. Thus, the policy statements restricting consideration of factors are

simply not "pertinent" in light of § 3553(a)(1) & (2).

impetuousness and recklessness that may dominate in younger years can subside."). In this case, the court may conclude that Caleb's youth, naivete, and impressionableness are all mitigating factors. This is based not only on the offence conduct demonstrating just how naïve and unsophisticated he was about his conduct, but also on the assessment of Dr. Wert finding those exact same characteristics.

**b.  <u>A downward departure or variance is warranted because the conduct here was aberrant behavior for the defendant</u>**

Section 5K2.20 of the Guidelines lays out the requirements for a departure based on aberrant conduct. Generally, the departure is authorized for "a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20(b). Where a defendant might not strictly qualify for a departure under § 5K2.20, a district court may still vary downward where the offense appears to be an isolated mistake a defendant's otherwise law-abiding life. *See, e.g., U.S. v. Howe*, 543 F.3d 128 (3d Cir. 2008) (affirming probationary sentence and temporary home confinement for wire fraud despite an eighteen to twenty-four month Guideline range, where appellate court construed district court to have termed the

offense an "isolated mistake" in the context of Howe's otherwise long and upstanding life, despite the government's assertion Howe waged a two-year campaign to cover up a six-figure fraud on the Air Force); *U.S. v. Germosen*, 473 F. Supp. 2d 221 (D. Mass. 2007) (sentence of two years' probation with six months' home detention justified where Guideline range was thirty-seven to forty-six months for conspiracy involving heroin importation because although defendant disqualified from aberrant behavior departure because of "serious drug trafficking offense," defendant was first time offender who was "far down the organizational tree"). Similarly, in this case, this limited period of criminal conduct appears to be aberrant behavior in Caleb's otherwise law-abiding life as a successful high school student on his way to college. This is brought home by the letters of his family and close family friends: people who have known him his whole life.

    **c.** <u>**A lower sentence is warranted because the defendant is a first-time offender**</u>

       For first-time offenders, long periods of incarceration can do more damage than good by isolating individuals from their communities. "When prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences, they are more

likely to become institutionalized, lose pro-social contracts in the community, and

become removed from legitimate opportunities, all of which promote recidivism."

Valerie Wright, Deterrence in Criminal Justice, The Sentencing Project, at 7 (Nov.

2010). Indeed, studies reveal that low-risk offenders who are sentenced to long

periods of incarceration are more likely to reoffend. *Id. See also United States v.*

*Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming downward variance, justified in part

by court's finding that prison would mean more to this defendant than one who

has been imprisoned before).

### d. The defendant is a low recidivism risk

Young or first-time offenders may also receive downward departures based

on a low risk of recidivism. *See, e.g., U.S. v. Ross*, 557 F.3d 237 (5th Cir. 2009)

(below-Guideline sentence was reasonable based on defendant's lack of criminal

history, strong family support, and youth as mitigating factors, and a psychiatrist

who had evaluated the defendant had testified that he had a low likelihood of

recidivism); *U.S. v. Prisel*, 316 F. App'x 377 (6th Cir. 2008) (affirming district court's

decision to vary below the recommended Guidelines range of twenty-seven to

thirty-three months and sentence the defendant to one day of imprisonment

followed by three years of supervised release (including eighteen months of

electronic home monitoring) on a charge of possession of child pornography

where defendant was a one-time offender and psychiatric testimony indicated that his risk of recidivism was low); *U.S. v. Cabrera*, 567 F. Supp. 2d 271 (D. Mass. 2008) (granting variance of twenty-four months in part because defendant in drug sting was first time offender, and Sentencing Commission studies indicate recidivism rates in that group are extremely low). Similarly, in this case, the likelihood that Caleb will reoffend is extremely low. He has no criminal history, he has a plan to get his college degree while serving his sentence, and he has a supportive and involved family and support network.

3.  **A below Guideline sentence is appropriate in this case because factors proven only by a preponderance of the evidence had an extremely disproportionate impact in the defendant's advisory Guideline sentencing range**

A below Guideline sentence is appropriate where the preponderance standard set forth in § 6A1.3 is insufficient to ensure a sentence that complies with § 3553(a).[3] "A district judge who is justifiably reluctant to impose a sentence

---

[3] The Commission developed the concept of relevant conduct as part of its effort to create a system under which the court punishes the defendant for the "real offense" or the actual conduct committed by the defendant (as opposed to only

resting primarily on facts proven only by a preponderance of the evidence is now

free to deviate from the Guidelines." *U.S. v. McGowan*, 288 F. App'x 288, 292 (7th

_____

the conduct with which the defendant was charged and of which he was

convicted). See U.S.S.G. ch. 1, pt. A(4). (The Guidelines' Resolution of Major

Issues). The theory behind relevant conduct was that it would prevent prosecutors

from controlling sentencing outcomes through charge bargaining. *Id.* But the

opposite has occurred—the use of uncharged, dismissed, and acquitted crimes in

calculating the Guideline range transferred sentencing power to prosecutors and

created hidden and unwarranted disparities from the outset. *See, e.g.,* Ilene H.

Nagel & Stephen J. Schulhofer, A Tale of Three Cities: An Empirical Study of

Charging and Bargaining Practices Under the Federal Sentencing Guidelines, 66 S.

CAL. L. REV. 501, 557 (1992); U.S. GEN. ACCOUNTING OFFICE, CENTRAL

QUESTIONS REMAIN UNANSWERED 14-16 (Aug. 1992); FED. COURTS STUDY

COMM., REPORT OF THE FEDERAL COURTS STUDY COMMITTEE 138 (Apr. 2, 1990).

The Commission has acknowledged that the relevant conduct rule "is not working

as intended." See U.S. SENTENCING COMM'N, FIFTEEN YEARS OF GUIDELINES

SENTENCING: AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE

SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM at 92 (Nov. 2004).

Cir. 2008). *See also Jones v. U.S.*, 135 S. Ct. 8, 9 (2014) (Scalia, J., joined by Thomas,

J., and Ginsburg, J. dissenting from the denial of the writ of certiorari where the

defendant's sentence was increased significantly based on acquitted conduct that

the judge found by a preponderance of the evidence); *U.S. v. Vaughn*, 430 F.3d

518, 525 (2d Cir. 2005) (district court should independently assess "the weight and

quality" of relevant conduct evidence under § 3553(a)); *Villareal-Amarillas*, 562

F.3d at 898; *U.S. v. Olsen*, 519 F.3d 1096, 1106 n.11 (10th Cir. 2008). The court can

do this by analyzing whether the evidence has been proven beyond a reasonable

doubt for purposes of the § 3553(a) analysis, and by disregarding as insufficiently

reliable whatever evidence fails to meet that burden. *See U.S. v. Wendelsdorf*, 423

F. Supp. 2d 927, 937 (N.D. Iowa 2006); *U.S. v. Gray*, 362 F. Supp. 2d 714, 723

(S.D.W. Va. 2005) (continuing to calculate the Guideline sentence using a

preponderance of the evidence standard but analyzing evidence beyond a

reasonable doubt for purposes of assessing the Guidelines' reliability and

conducting the § 3553(a) analysis). In this case, Sentencing Guideline

enhancements have increased the offense level from 34 to a whopping 47. Those

enhancements are based almost entirely on uncharged conduct, much of which is

not even proven by a preponderance of the evidence standard. Detailed

arguments on the standard of proof of specific evidence in this case was submitted

1    in the defendant's post-conviction motions.

2    **4.  A downward departure under section 5K2 is warranted because**

3    **sentencing enhancements have greatly increased the Guideline range**

4    In cases where a sentencing enhancement greatly increases the Guideline

5    range, the court may apply a downward departure under U.S.S.G. § 5K2.0. *See U.S.*

6    *v. Lombard*, 72 F.3d 170, 186 (1st Cir. 1995) (where acquitted conduct is

7    substantively more serious than convicted conduct and results in an enormous

8    increase to the sentence, "a downward departure under U.S.S.G. § 5K2.0 was

9    within the court's discretion"); *U.S. v. Concepcion*, 983 F.2d 369, 389 (2d Cir. 1992)

10   ("the district court retains discretion to downwardly depart where the sentence

11   would be dramatically increased by reason of the uncharged relevant conduct");

12   *U.S. v. Cordoba-Murgas*, 233 F.3d 704, 709 (2d Cir. 2000) (downward departures

13   are appropriate in a case involving "(i) an enormous upward departure adjustment

14   (ii) for uncharged conduct, (iii) not proved at trial and (iv) found only by a

15   preponderance of the evidence, (v) where the court has substantial doubts as to

16   the accuracy of the finding").

17   **5.  A downward departure is warranted to avoid sentencing disparities with**

18   **other fentanyl offenders**

19   The penalties for fentanyl and fentanyl analogues are significantly more

severe than for other opiates. For example, a ten-year mandatory minimum penalty is triggered by 400 grams of fentanyl or 100 grams of fentanyl analogue compared to one kilogram of heroin. In the latest year where data is available, 2019, over a third of both fentanyl (36.3%) and fentanyl analogue (34.8%) offenders received a variance, which is similar to the percentage of variances below the guideline range for other drug offenders (32.6%). U.S. Sentencing Commission, "Fentanyl and Fentanyl Analogues Federal Trends and Trafficking Patterns, 39 (January 2021). Roughly one third of fentanyl offenders (34.2%) and fentanyl analogue offenders (30.0%) received a downward variance. *Id.* In fiscal year 2019, nearly all fentanyl and fentanyl analogue offenders pleaded guilty (97.7% and 93.1%, respectively) and were sentenced to prison (97.2% and 97.0%, respectively), which is nearly the same proportion as other drug offenders. *Id.* Approximately one-quarter (25.1%) of fentanyl offenders and one-fifth (21.9%) of fentanyl analogue offenders were convicted of an offense carrying a five-year mandatory minimum penalty. *Id.* at 36. A nearly identical proportion of fentanyl (23.7%) and fentanyl analogue (18.9%) offenders were sentenced for an offense carrying a ten-year statutory mandatory minimum. *Id.*. The average sentence for fentanyl offenders was 74 months and the median sentence was 60 months. *Id.* at 39. In other words, a substantial portion of people charged with fentanyl crimes

were charged with the same offense level as the defendants here, and the average

sentence was 74 months. This is decades shorter than probation's calculated

Guideline range of Life for Caleb Carr.

## Conclusion

Based on a totality of the circumstances, a sentence of 12 years is sufficient

but not greater than necessary to achieve the sentencing goals under §3553 for

Caleb Carr.

Date: October 19, 2022                    s/ Sandy D. Baggett
                                          Sandy D. Baggett, WSBA #54320
                                          P.O. Box 1069
                                          Spokane, WA 99201
                                          sandy@sandybaggett.com
                                          (509) 822-9022

1

2

**Service Certificate**

3      I certify that on October 19, 2022, I electronically filed the foregoing with

4 the Clerk of the Court using the CM/ECF System, which will notify Assistant

5 United States Attorneys: Richard R. Barker and Stephanie A. Van Marter.

6                              s/ Sandy D. Baggett
                             Sandy D. Baggett, WSBA #54320
7                              P.O. Box 1069
                             Spokane, WA 99201
8                              sandy@sandybaggett.com
                             (509) 822-9022

9

10

11

12

13

14

15

16

17

18

19